NATIONAL AMUSEMENTS, INC. *vs.* COMMISSIONER OF THE
INSPECTIONAL SERVICES DEPARTMENT OF BOSTON.

No. 87-799.

Suffolk.    March 14, 1988. — May 31, 1988.

Present: ARMSTRONG, CUTTER, & BROWN, JJ.

*Zoning,* Issuance of permit, Amendment of by-law or ordinance. *Permit.*
*Municipal Corporations,* Building inspector. *Boston.*

In an action seeking relief in the nature of mandamus to compel the inspec-
tional services department of Boston to issue permits for the construction
of a shopping center, the judge, in ruling that the permit application
was, by virtue of the Boston Zoning Code and Enabling Act, St. 1956,
c. 665, § 5, subject to a zoning regulation amendment, adopted while
the permit application was pending, that prohibited the shopping center
use on the locus in question, properly concluded that the zoning amend-
ment was in substantial accord with the notices published and that the
nine months' delay before it was adopted was, in the circumstances,
not "unreasonable or unnecessary." [86-88]

CIVIL ACTION commenced in the Superior Court Department
on December 15, 1986.

The case was heard by *Elbert Tuttle,* J.

*Robert M. Bonin (Jonathan D. Tamkin* with him) for the
plaintiff.

*Mary Ellen Nolan & Marsha Weinerman,* Assistant Corpor-
ation Counsel, for the defendant.

CUTTER, J.   National Amusements, Inc. (National), appeals
from a judgment denying relief upon a complaint in the nature
of mandamus brought by National against the commissioner
(sometimes hereafter referred to separately) of the inspectional
services department (ISD) of Boston. National seeks to compel
the commissioner to issue permits for the construction of a
neighborhood shopping center on about 602,000 square feet
of land (the locus) at 1213 Veterans of Foreign Wars Parkway in

the West Roxbury section of Boston. The questions before us involve statutory provisions, applicable only to Boston, different from those which would apply if the locus had been situated in any other city or town, to which (at least in most instances) G. L. c. 40A, as amended, would be applicable.[1] See *Emerson College* v. *Boston*, 393 Mass. 303 (1984).

In 1985, the locus was in a B-1 (business) zone where a shopping center was a permitted use. In late 1985, National had retained an engineering firm to design a shopping center for the locus. On April 25, 1986, an engineer from that firm and a building consultant (Alice Boelter) retained by National filed for National with ISD a building permit application, two plans and a check for $64,000 for a permit fee.

On May 1, 1986, representatives of National had attempted to file with ISD a landscape and parking plan. The plan was refused. Edward S. Whelan of ISD informed National's representatives that the Boston Redevelopment Authority (BRA)[2] was attempting to secure a rezoning of the area (including the locus), and, indeed, on April 16, 1986, the director of BRA had written to the commissioner of ISD suggesting that no permit be issued in the area.

On May 2, 1986, BRA and West Roxbury Neighborhood Council applied to the zoning commission (by application for map amendment No. 250) to change the zoning of the locus

---

[1] Although the proceedings under the special enabling statute applicable to zoning matters in Boston (see St. 1956, c. 665, as amended through 1983) have complexities not encountered in any other community, the issues argued by National, after the findings, rulings, and order for judgment of the trial judge, largely can be discussed without reproducing or describing in detail the whole Boston statutory background.

[2] The following city instrumentalities were involved in this controversy: (1) The BRA operates as a planning board for Boston. See G. L. c. 121B, § 4. (2) The zoning commission of the city of Boston, which exists under St. 1956, c. 665 (the so-called "enabling act," as amended), adopts zoning regulations and amendments. It is housed with BRA but is "not . . . subject to [its] supervision or control." (3) The board of appeal established by the enabling act (§§ 8, 9) deals with various building and zoning code refusals and may grant variances. (4) ISD enforces the State Building Code and the Boston Zoning Code. See Boston Ordinances of 1983, c. 8, and Boston Zoning Code, art. 5-1.

from B-1 to R-5, a residential district, and on the same day (by application No. 251) BRA applied to change the B-1 zoning of the area including the locus to other zoning categories. Both applications were set down and advertised (on May 5, 1986) for hearing before the zoning commission on June 2, 1986. On this latter application (No. 251) the record indicates that the zoning commission never took any definitive action.

On June 2, 1986, at the advertised hearing, no action was taken by the zoning commission on map amendment No. 250. Again, on June 25, 1986, no action was taken.[3] In the meantime, there was correspondence between the commissioner of the ISD and counsel for National. In that correspondence it was made clear that the commissioner was taking the position that no permits would be issued by ISD while the proposed rezoning was pending.[4]

The present mandamus complaint was filed on December 15, 1986, requesting that the Superior Court order the commissioner to issue appropriate permits for the shopping center project. A judge of the Superior Court on December 26, 1986, by order, after reviewing ISD's frustrating delays in acting on National's requests for building and other permits needed for the shopping center project, referred to § 5 of the enabling act (St. 1956, c. 665) set out in the margin,[5] and stated, "The

---

[3] The Boston Zoning Code and Enabling Act (St. 1956, c. 665, § 3, as amended by St. 1958, c. 77, § 2) requires seven concurring votes to adopt or reject a proposed amendment.

[4] National appealed to the board of appeal from the refusals of the commissioner to issue permits. The practical result of the appeal (among other matters discussed in the board's opinion) was a decision by the board that the commissioner of the ISD had not had time fully to review National's permit application prior to the advertisement of map change application No. 250. The board also indicated that ISD should have proceeded with its review promptly after the permit requests were filed, and that, "where the applicable zoning regulations change after a permit application is filed, but before it is reviewed and allowed, the new . . . ordinance controls the permit application." National's appeals were not granted, except for some minor aspects. The board on December 5, 1986, remanded the matter to the commissioner for action consistent with its decision.

[5] Section 5 reads (emphases supplied): *"No zoning regulation or amendment thereof shall affect any permit issued* or any building or structure lawfully begun *before notice of hearing before the zoning commission has first*

nine months which the [b]oard has taken so far is not reasonable delay, especially considering . . . that no rezoning has yet been adopted."

The trial judge then referred to *Ouellette* v. *Building Inspector of Quincy*, 362 Mass. 272, 278-279 (1972), which discussed G. L. c. 40A, §§ 11 and 12, as they read prior to the very substantial revision by St. 1975, c. 808. Then § 11 contained language found in the final sentence of § 5 of the enabling act, and § 12 contained language found in § 7 of the enabling act. The *Ouellette* opinion (discussing old c. 40A, § 12) pointed out (at 279) that there was a "distinction between a proposed zoning amendment . . . and an amendment which has been adopted but has not yet been approved and published . . . . Because of this . . . difference, while a building inspector may refuse to issue a permit because of a *newly adopted* zoning amendment, we are unwilling to say that he may refuse to issue a permit merely because of a *proposed* zoning amendment," i.e., one that may never be adopted by the body authorized to adopt the change.[6] In any event, the *Ouellette* decision (at 280) held that while the similar language found in old c. 40A, § 12, and in § 7 of the enabling act, viz., "would be in violation of any zoning ordinance . . . or amendment thereof," could be regarded as "sufficiently broad to encompass an amendment which has been *adopted but is not yet effective*, . . . a fair construction must exclude *a mere proposed zoning*

---

been given; provided, that construction work under such a permit is commenced within six months after its issue, and the work, whether under such permit or otherwise lawfully begun, proceeds in good faith continuously to completion so far as is reasonably practicable under the circumstances. *The issuance of a permit* or the beginning of work upon a building or structure, or a change of use, *after such notice has been given, shall not justify the violation of a zoning regulation or an amendment thereof subsequently adopted as the outcome of such hearing and in substantial accord with such notice; provided, the subsequent steps required for the adoption of such regulation or amendment* thereof are *taken in their usual sequence without unnecessary* or unreasonable *delay*."

[6] See the *Ouellette* opinion (at 279, 280 n.12) referring to the provisions of old § 11 of former c. 40A about " 'unnecessary . . . delay' in the adoption." See note 5, *supra*.

*amendment*" (emphases supplied).[7] Probably because of this language, the trial judge ordered the commissioner "within ten . . . days . . . [to] issue the building and other appropriate permits to . . . [National] or give . . . [National] written notice of his reasons for denying . . . [the] permit."[8]

The trial judge's decision stimulated ISD to very rapid activity on National's permit application. On January 6, 1987, ISD's acting zoning administrator denied National a permit for the asserted reason that National's plans then filed did not delineate individual parking spaces. On January 13, 1987, National's engineers filed a parking plan showing 652 individual parking spaces, which more than complied with the parking requirements for the proposed facility (419 spaces) in a B-1 zone.[9] ISD's acting zoning administrator gave zoning approval to the

---

[7] The *Ouellette* opinion went on (at 280) to point out that, even if the proposed zoning amendment there discussed actually had been adopted, that fact did not appear from the record then before the *Ouellette* court. The court also noted that the record did not show the events subsequent to the notice of the initial hearing to have been taken "without . . . unreasonable delay" (citing old c. 40A, § 11) in the adoption of the amendment. The opinion (at 280) concluded that even adoption of the proposed zoning amendment "would not bar the issuance of the [requested] building permit." The opinion ended with a decision that the landowner was "entitled to a building permit."

[8] The trial judge in his final findings and order for judgment altered this order by finding, that, because of "the status of National's application on December 26, 1986[,] and . . . [because] it normally takes [ISD] three to four months to . . . [investigate] a permit application, it was not reasonable for the [c]ourt to expect . . . [ISD] to be able to . . . issue or deny a permit to National without ten days."

[9] No work had previously been done by ISD on National's application, because in May, 1986, the commissioner had told ISD's review staff to hold the application at the zoning department level, pending rezoning. Indeed, the commissioner conceded at trial that he had told a West Roxbury neighborhood group shortly before trial that he had held the permit back for nine months but that he was "running out of reasons," and that the parking space order was "a ploy designed to give the city some breathing time." Indeed, even as late as January 14, 1987, the commissioner (of ISD) wrote to a vice president of National pointing out various defects asserted by ISD with respect to National's application, including the parking space objection stated in the text, and reiterating the position (rejected by the trial judge in his order of December 26, 1986) that ISD delay was justified by the circumstance that the zoning commission was considering a map change.

application on February 3, 1987. The application then went to ISD's chief plan examiner, who ordered his subordinates to give the application a quick review, which enabled him on February 6, 1987, to come up with a memorandum of thirty-two alleged deficiencies in National's application.

The zoning commission (see note 2, *supra*) also was roused to action by the court order of December 26, 1986. On February 6, 1987, more than seven commissioners (see note 3, *supra*) voted to rezone the business area containing the locus from B-1 to R-.8. The vote was based on map amendment No. 250, which had proposed a shift of the locus from a B-1 zone to an R-.5 zone. No published notice or advertisement of the hearing on map amendment No. 250 had been given since the notice published on May 5, 1986.[10]

Trial of the complaint began before the same Superior Court judge who had framed the order of December 26, 1986, which had awakened ISD to perform its duties. Evidence was presented at trial which justified the judge's findings that, on National's application, ISD "did not follow its normal procedures, but halted action due to the BRA letter" (of April 16, 1986) to the commissioner "relative to a proposed rezoning of the area." Even if the commissioner and various units of ISD had thought it was in the public interest for them to delay action on National's application in view of a zoning change about to be recommended by BRA, it was their duty (as the board of appeal had in effect told them) to proceed with reasonable diligence and promptness to afford to National, as a property owner, the commissioner's best judgment about National's permit application under the zoning provisions then in effect.

---

[10] From the standpoint of National and other persons owning land in the former B-1 zone, changing the B-1 zone to a residential R-.8 zone (multifamily residential use), rather than to a R-.5 zone (one and two family residences) was probably advantageous in the sense that it would permit more intensive development of the land. To owners in adjacent zones, although it was probably better (and closer to their wishes) than to have the locus in a B-1 zone and used for a shopping center, the change to R-.8 did permit apartment houses which can have detrimental effects upon adjacent areas. The other provisions (e.g., lot size, set-back) applicable in zone R-.5 are more restrictive than those applicable in zone R-.8.

See *Castelli* v. *Selectmen of Seekonk*, 15 Mass. App. Ct. 711, 713-715 (1983), in addition to what was said in the *Ouellette* case, 362 Mass. at 275-278. There should have been no abnormal delays in ISD by reason of requests from other city officials, such as BRA's request of April 16, 1986, that no permits be granted for the locus.[11] There probably also should have been greater effort by the commissioner of the ISD to make it plain to BRA that it should move promptly on its proposed map amendment so as to avoid unnecessary loss to, and expenditures by, National (and other owners similarly situated) arising from any new map change. The record suggests that the zoning commission, on the basis of BRA's recommendations, could have moved perhaps five months earlier.[12]

The trial judge's findings of May 11, 1987, after trial, show that he fully understood the difficulties of the situation presented to him. He ruled that § 5 of the enabling act (see note 5, *supra*) controlled the determination whether the map amendment, adopted on the very eve (February 6, 1987) of trial, was applicable to National's permit application of April 25, 1986. He stated that the application, by virtue of § 5, was "subject to any . . . amendment adopted as a result of the notices of hearing published on May 5, 1986, . . . if the . . . amendment was [1] in substantial *accord with the notices* and [2] was adopted *without unreasonable or unnecessary* delay" (emphasis supplied). After making note that National's application for a permit did not vest any rights in National, see *Collura* v. *Arlington,* 367 Mass. 881, 888 (1975), and the various differences between an R-.5 zone and an R-.8 zone (see note 10,

---

[11] The judge expressly found that BRA (after his first order of December 26, 1986) "promptly took action to obtain a zoning change in order to prevent the erection of . . . [National's] shopping center" on the locus.

[12] The record also suggests that there may exist doubts as to the power of BRA and the zoning commission to adopt procedural rules and regulations affording to each body a reasonable amount of time to investigate and consider map amendments so as not to preclude the applications of such amendments to permits applied for or pending during their deliberations. If more authority is needed, that may well necessitate legislative action. In any such consideration, the discussion in *Collura* v. *Arlington,* 367 Mass. 881, 882-885 (1975), may be helpful.

*supra*), he concluded, first, that the change of zoning was "in substantial accord with the proposed amendment advertised" on map amendment application No. 250.

For this conclusion the judge cited *Burlington* v. *Dunn*, 318 Mass. 216, 219-220, cert. denied, 326 U.S. 739 (1945), and *Johnson* v. *Framingham*, 354 Mass. 750, 753 (1968). In the *Burlington* case at 218-219, Chief Justice Qua treated changes by the planning board in its proposed amendments, made after its hearing and not reflected in the town meeting warrant as "not of a fundamental character. They did not change the identity of the proposal . . . ." In the *Framingham* case (at 752-755), Chief Justice Wilkins, writing for the court, relied on the *Burlington* case for even greater changes from the recommendations of the planning board without affording that board a chance to consider the change.

The trial judge ruled, second, that the failure of the zoning commission to act on map amendment No. 250 from May 5, 1986, to February 6, 1987, almost precisely nine months, was not "unreasonable or unnecessary" in the light of "the complexities of urban planning in large cities such as Boston." Unquestionably the number of bodies (see note 2, *supra*) which in Boston may have to act in some manner with respect to zoning map amendments makes the process cumbersome. The process of city planning is intended by applicable legislation to proceed in an orderly course without unreasonable efforts by developers to obtain permits prior to the first steps to effect appropriate zoning changes. Such a race between city planners and developers for the use of increasingly scarce vacant land may well turn out not to be in the public interest. That circumstance, among others, has led courts, in recent years at least, to avoid narrow or unduly technical interpretations of the extensive powers granted by G. L. c. 40A and comparable zoning enabling acts. See the *Collura* case, 367 Mass. at 885. See also *Hallenborg* v. *Town Clerk of Billerica*, 360 Mass. 513, 516-521 (1971). We think that a strict application of the *Ouellette* case, 362 Mass. at 280 (see note 7, *supra*) is not required. That case was decided under a different statute. The delay here was materially shorter. The trial judge here (before

any permit was issued) had before him the actual zoning amendment adopted and could reasonably take into account public interest considerations. We need not consider whether a more substantial delay or misconduct not present here would lead to a different result.

The correctness of the decision of the trial judge is not free from doubt. The zoning commission's decision to reject the BRA's planning recommendation of a map change to R-.5 and to adopt instead a compromise solution of a lesser change of the locus to an R-.8 zone which probably would afford more housing, however, was a change within the general purpose of making any zoning change. See notes 10 and 11, *supra*. We regard the judge's decision as reasonable. In the circumstances of this case, the public interest, as determined by the zoning commission, should be protected despite the failure of BRA, the zoning commission, and ISD to act more promptly and with proper administrative coordination. On this record, the delay which occurred was permissible under (and consistent with, the purpose of) § 5 of the enabling act.

*Judgment affirmed.*